AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | Case No. 1:19MJ 105 |
| *or identify the person by name and address)* | ) | |
| IN THE MATTER OF THE SEARCH OF INFORMATION | ) | |
| ASSOCIATED WITH THE EMAIL ADDRESS: | ) | |
| REALCUBATURA@GMAIL.COM THAT IS STORED AT | ) | |
| PREMISES CONTROLLED BY GOOGLE, INC. | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

### See Attachment A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized):*

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 18 U.S.C. Sections 1962(d) | RICO Conspiracy | |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Brian Christ, DOT
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/15/19

City and state: Cincinnati, Ohio

_____
*Judge's signature*

Hon. Karen L. Litkovitz, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE EMAIL ADDRESS: REALCUBATURA@GMAIL.COM THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, INC. | Case No. __1:19MJ-105__ <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Brian J. Christ, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to require Google, Inc. to disclose to the government copies of the information (including the content of communications) associated with certain accounts that is stored at the premises controlled by Google, Inc., an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.  The account to be searched are realcubatura@gmail.com (hereinafter, the "Subject Account"), which are further described in the following paragraphs and in Attachment A and B.

2.     I am a Special Agent with the United States Department of Transportation (USDOT), Office of Inspector General (OIG), in Columbus, Ohio.  I have been employed as a USDOT-OIG Special Agent for approximately four years.  I have successfully completed criminal investigator training at the Federal Law Enforcement Training Center in Glynco, Georgia.  As a Special Agent, I conduct criminal investigations of individuals and entities for possible violations of federal criminal laws, particularly those laws found in Title 18 and 49 of the U.S. Code that are relevant to the USDOT, Federal Motor Carrier Safety Administration

(FMCSA). FMCSA responsibilities include monitoring and enforcing compliance with regulations governing safety and commerce related to interstate motor carriers, in particular Title 49, Code of Federal Regulations, Part 375, which governs the transportation of household goods by motor carriers. Further, I have specific experience and knowledge investigating the type of violations set forth below. I have participated in numerous search warrants of email accounts and at businesses and residences for documents, records, receipts, and computer-related equipment used to store information.

3.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of § 1962(d) by knowingly and intentionally conspiring to conduct and participate in the conduct of the affairs of a criminal Enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and (5), by conspiring to commit multiple acts of 18 U.S.C. § 1343 (relating to wire fraud); 18 U.S.C. § 659 (relating to the theft from interstate shipment); 18 U.S.C. § 1951(a) (relating to extortion); and 18 U.S.C. § 1028(a) (relating to fraud and related activity in connection with identification documents) have been committed by individuals that are named as defendants in paragraph 6 below and the attached Indictment, along with other co-conspirators. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction

2

over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### A. The Grand Jury Charge

6.      Based on the above, on July 25, 2018, a federal grand jury returned an Indictment

charging the following individuals:

       (a) ANDREY SHUKLIN,

       (b) SERGHEI VERLAN,

       (c) PHYLLIS RICCI QUINCOCES, a/k/a "Faith Ashford," "Grace Rubestello," "Phyllis Ricci," "Phyllis Ann,"

       (d) EVGENIA KUKUY, a/k/a "Jenny K," "Evgenia Kukuv,"

       (e) VLADIMIR PESTEREANU, a/k/a "Vova,"

       (f) IEVGEN KARIAKA, a/k/a "Eugene,"

       (g) AKHLIDDIN KALONOV,

       (h) ROMAN IAKOVLEV,

       (i) SANJAR FAYZIVEY,

       (j) SERGEY BOCHAROV,

       (k) JESSICA MARTIN, a/k/a "Emma Ricci," "Mary Austin," and

       (l) SETH NEZAT, a/k/a "Andrew Johnson", "Andrew Butler," "Jason," "Kyle Walker,"

(hereinafter, the "defendants"), in a one Count Indictment with participating in a RICO

conspiracy through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The

indictment is attached and incorporated by reference.

7.      The grand jury found probable cause that the defendants, along with corporate

entities JBR Underground, LLC, United National Moving and Storage, National Relocation

Solutions, Independent Van Lines, National Relocation Van Lines, US Relocation Systems, First National Moving and Storage, Public Moving and Storage, Public Moving Services, Smart Relocation Solutions, Presidential Moving Services, Unified Van Lines, and Flagship Van Lines (referred to collectively as "the affiliated companies"), and others known and unknown to the Grand Jury, constituted an "Enterprise" as defined in 18 U.S.C. § 1961(4), that is, a group of individuals and entities associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce (referred to hereinafter as the "Moving Enterprise").

8.      The grand jury found probable cause that the defendants violated § 1962(d) by knowingly and intentionally conspiring to conduct and participate in the conduct of the affairs of the Moving Enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and (5), by conspiring to commit multiple acts of 18 U.S.C. § 1343 (relating to wire fraud); 18 U.S.C. § 659 (relating to the theft from interstate shipment); 18 U.S.C. § 1951(a) (relating to extortion); and 18 U.S.C. § 1028(a) (relating to fraud and related activity in connection with identification documents).

## B. The Investigation

9.      Beginning in 2016, the USDOT and the FBI initiated an investigation into members of a criminal organization involved in the shipment of household goods, following hundreds of complaints to the USDOT by customers-victims. The investigation indicates that by at least August 2013, both Shuklin and Verlan operated together as movers of household goods through JB Underground, LLC, and that company almost immediately starting receiving complaints relating to moves after Shuklin and Verlan took control.

10.     The defendants operated and worked through the affiliated companies to move

interstate shipments of household goods. The affiliated companies operated as a single-corporate entity, all managed and operated by the same owners, leadership, and employees.

11. The purpose and object of the conspiracy was for the defendants to enrich themselves and the Moving Enterprise by defrauding and extorting customers who hired the Enterprise to move their household goods. The Enterprise operated within the Southern District of Ohio and throughout the country. Generally, the scheme worked as follows: the Moving Enterprise started a company that represented itself falsely through emails to customers and representations on their website as a moving company with over a decade of experience and many satisfied customers. The Enterprise then induced new customers to select its services by undercutting competition with a low "binding" moving estimate without first conducting an onsite inspection of household goods. Pursuant to federal regulations, the binding estimate cannot be changed once movers begin loading. However, in contravention of the law, the Enterprise routinely increased the price of the binding estimate on site, after household goods were loaded on the moving trucks.

12. Through customer interviews, agents learned that after loading the household goods, the affiliated "moving company" would falsely claim that the goods weigh more and/or take up more cubic footage than contemplated in the binding estimate. The company then extorted the customers into paying an inflated "revised" price to get their goods delivered. The extortion scheme was successful. By waiting until the goods were loaded to increase the price, the customers were vulnerable and desperate. Some customers were told that if the inflated price was not paid in full, the company would keep the household goods. The company has followed through with its threats to keep the household goods of customers who refused to pay the (inflated) revised price, and their goods have not been delivered, sometimes years after the move.

5

For example, agents executing a premises search warrant on May 31, 2017 at the 5150 Duff Dr., West Chester, 45246, warehouse location found household goods from a move that took place on May 24, 2016; the customers had never received their household goods, despite the Enterprise receiving a down payment for delivery of the goods. To date, there are over 1,000 identified victims of the Enterprise. Agent review of customer documents indicates the Enterprise increased the price above the binding estimate in well over 90% of the moves for which there is adequate documentation.

While providing an initial, false, low bid to induce business with no intention of adhering to the estimate was fraudulent, internal documents show the price increase was fraudulent as well. A review of internal documents indicates that the newly calculated cubic feet number is false. Evidence recovered during the execution of a search warrant indicates that the company often tracks the "real" or "actual" cubic feet in contrast to the cubic feet charged to the customers. For example, it was the practice of certain defendants to email to one another documentation indicating the "actual" or "real" cubic footage used in a move, alongside documentation indicating a higher amount of cubic footage that the Enterprise used as the basis for the amount charged to the customer. A sample of these emails includes:

- On May 20, 2015, an Ohio warehouse employee emailed Tatianna Rakhmaninova (Shuklin's wife) who forwarded to Shuklin an excel spreadsheet that listed "Estimate Cu Ft," "Real Cu Ft," and "BOL Cu Ft," (*i.e.*, the "bill of lading" cubic feet) for three customers, indicating the Enterprise was knowingly charging customers for more cubic feet in the bill of lading than the real cubic feet used.

- On August 2, 2015, an Ohio warehouse employee emailed Shuklin, Verlan, and others copies of a National Relocation Solutions customer's documents showing the customer was charged for using 2,177 cubic feet but the email indicated customer only used "Actual space 1,350" cubic feet.

- On May 25, 2016, an Ohio warehouse employee emailed Shuklin stating First National Moving and Storage customers' goods used "Real space 3300" cubic feet,

6

however, they were charged for using 4,400 cubic feet. These customers never received their household goods.

- On August 3, 2016, a Colorado warehouse employee emailed Shuklin and others stating a First National Moving and Storage customer had used "2300 real cubes" but an attachment to the email shows that the customer was charged in the bill of lading for 2,835 cubic feet.

- On August 22, 2016, an Illinois warehouse employee sent to Shuklin and others an email stating a First National Moving and Storage customer had "Real Space 2300 cf" but an attachment to the email shows the customer was charged for 2,800 cubic feet.

These emails, involving multiple affiliated companies and different warehouse employees throughout the country, show that the Moving Enterprise systematically charged customers inflated prices. These emails further show that the Moving Enterprise used email, including the Subject Account (as described in detail below), to send and receive information regarding the erroneous and inflated prices of customers' moves.

13. Once enough customers complained and/or USDOT placed that company out of service as set forth in the Indictment, the Enterprise stopped operating as that particular moving company. The evidence shows that the Enterprise then "reincarnated" as a new company by submitting false documents to federal regulators and then, once again, misrepresenting the new company's years of service and qualifications to induce victims to use the Enterprise's moving services. As set forth in the Indictment, the Moving Enterprise also furthered the conspiracy by submitting fake reviews to online sources regarding services provided by affiliated companies of the Moving Enterprise to induce customers to choose the Moving Enterprise.

14. The Enterprise has reincarnated as at least twelve different FMCSA-regulated companies since 2013—the affiliated companies as set forth above—all operating as a single entity.

7

15. According to customer interviews, the Enterprise at times simply refused to deliver a customer's household goods despite receiving payment as agreed to by the parties; losing both their payment for the move and their household goods, the customer had little recourse because the Enterprise reincarnated under a new name every several months. The Enterprise has even threatened violence when doing so furthers the criminal conspiracy, including a bomb threat against employees of a company that operates a warehouse in Maryland where the Enterprise stored certain customers' household goods.

16. One of the defining characteristics about the Enterprise has been concealment— the Enterprise's efforts to conceal its identity, the identity of its leadership, and the true nature of its business. Documents filed with federal authorities repeatedly conceal the true owners of the Enterprise and its ties to past moving businesses that were shut down. In fact, the Enterprise even created counterfeit driver's licenses for individuals it named as owners of "reincarnated" new affiliated companies on federal regulatory filings. Members of the Enterprise also repeatedly concealed their true identities from customers. For example, during execution of a search warrant at the Enterprise's Florida location, agents recovered lists of aliases used by employees. The document indicates that, at that time, roughly two dozen employees used an alias or Sales Name. Further, by frequently reincarnating the Enterprise, the Enterprise concealed the true nature of its business from both federal regulators and customers.

C. The Subject Account

17. As set forth above and in the attached Indictment, the investigation has revealed that members of the Moving Enterprise emailed to one another documentation indicating the "actual" or "real" cubic footage used in a move, alongside documentation indicating a higher amount of cubic footage that the Enterprise used as the basis for the amount charged to the

8

customer. These emails show that the Moving Enterprise knowingly charged customers an inflated price because the actual amount of cubic footage used in moves was lower than the amount of cubic footage the customer was charged with using. Indeed, agents have recovered numerous spreadsheets from multiple warehouses run by the Moving Enterprise throughout the country that tracked the "real" cubic footage used in moves.

18.     Consistent with this, the investigation indicates that members of the Moving Enterprise, including defendants, sent dozens of emails to the Subject Account containing the real or actual cubic footage in moves along with documents showing the cubic footage charged. For example:

- On November 30, 2016, Iakovlev forwarded to Shuklin a prior email Iakovlev had sent to the Subject Account that stated a Public Moving and Storage customer's goods used "Real: 600" cubic feet, however, the moving documents indicated the customer was charged for using 1,250 cubic feet.

- On July 26, 2017, Iakovlev sent to the Subject Account, Shuklin, Verlan, Kukuy, and others an email stating a Public Moving and Storage customer's goods used "Real: 1150" cubic feet, however, the moving documents indicated the customer was charged for using 1,525 cubic feet.

- On June 5, 2017, Bocharov forwarded to Shuklin and Kukuy a prior email Bocharov had sent to the Subject Account that stated a Public Moving Services customer's goods used "Real space 750cf," however, the moving documents indicated the customer was charged for using 902 cubic feet.

- On June 12, 2017, Bocharov forwarded to Shuklin and Kukuy a prior email Bocharov had sent to the Subject Account that stated a Public Moving Services customer's goods used "Real space 1000 cf," however, the moving documents indicated the customer was charged for using 1,300 cubic feet.

- On July 26, 2017, a co-conspirator sent to the Subject Account, Shuklin, Quincoces, Verlan, Kukuy, and others an email stating a Public Moving Services customer's goods used "real: 500" cubic feet, however, the moving documents indicated the customer was charged for using 920 cubic feet.

19.     As set forth above, the Subject Account is realcubatura@gmail.com.[1] "Cubatura" is an Italian word translated to mean "cubic capacity" in English.[2] Thus, based on my training and experience and the investigation to date, I believe the Moving Enterprise tracked the "real cubic capacity" in moves performed by the Moving Enterprise, at least in part, through the Subject Account, along with the inflated cubic footage charged to customers—consistent with the email evidence noted above.

20.     This evidence establishes probable cause that the Subject Account will contain evidence relating to the charge set forth in the Indictment.

21.     In general, an email that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Google servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time. On or about January 8, 2019, a preservation letter was sent to Google to preserve all documents relating to the Subject Account.

## BACKGROUND CONCERNING EMAIL

22.     In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts at the domain name @gmail, like the email account listed in Attachment A. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore,

---

[1] The emails referenced above indicate that the Subject Account is tied to an individual named "Jim Black"; it is unclear who Jim Black is at this time.

[2] https://dictionary.reverso.net/italian-english/cubatura (defining cubatura as "cubic capacity"); https://translation.babylon-software.com/italian/to-english/cubatura/ (defining cubatura as "cubage").

the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

23.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

24.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins

to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

25.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

26.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that

access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

27.     Based on the foregoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

28.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal conspiracy as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and

search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

SPECIAL AGENT BRIAN J. CHRIST
U.S. DOT OIG

Subscribed and sworn to before me

This _15_ th day of February, 2019.

HONORABLE KAREN L. LITKOVITZ
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with realcubatura@gmail.com that is stored at premises owned, maintained, controlled, or operated by Google, Inc., a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA.

## ATTACHMENT B

### Particular Things to be Seized

I.     **Information to be disclosed by Google, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on January 8, 2019, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     The contents of all emails associated with the account from August 2013 to August 2018, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     The types of service utilized;

d.     All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

e.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken. The Provider is hereby ordered to disclose the above information to the government within **14 days** of service of this warrant.

## II.     Information to be seized by the government

1.     All information described above in Section I that constitutes evidence of

violations of 18 U.S.C. § 1962(d), those violations involving the financial or business affairs of

JBR Underground, LLC, United National Moving and Storage, National Relocation Solutions,

Independent Van Lines, National Relocation Van Lines, US Relocation Systems, First National

Moving and Storage, Public Moving and Storage, Public Moving Services, Smart Relocation

Solutions, Presidential Moving Services, Unified Van Lines, and Flagship Van Lines, and

ANDREY SHUKLIN, SERGHEI VERLAN, PHYLLIS RICCI QUINCOCES, a/k/a "Faith

Ashford," "Grace Rubestello," "Phyllis Ricci," EVGENIA KUKUY, a/k/a "Jenny K," "Evgenia

Kukuv," VLADIMIR PESTEREANU, a/k/a "Vova," IEVGEN KARIAKA, a/k/a "Eugene,"

AKHLIDDIN KALONOV, ROMAN IAKOVLEV, SANJAR FAYZIVEY, SERGEY

BOCHAROV, JESSICA MARTIN, a/k/a "Emma Ricci," "Mary Austin," and SETH NEZAT,

a/k/a "Andrew Johnson," "Andrew Butler," "Jason," "Kyle Walker," and others, and occurring

after August 2013 to August 2018, including:

> (a) The defrauding, stealing from, and extortion of customers seeking household
> moving services of money and property; impeding and obstructing investigations
> conducted by the government; false statements to federal regulators and
> customers; and/or transferring false documentation, to include fraudulent driver
> licenses.

> (b) Evidence indicating how and when the email account was accessed or used, to
> determine the geographic and chronological context of account access, use, and
> events relating to the crime under investigation and to the email account owner;

3

(c) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user IDs, including records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the user IDs about matters relating to the financial and fraudulent business affairs of the Moving Enterprise, including records that help reveal their whereabouts.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by GOOGLE, Inc., and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of GOOGLE. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of GOOGLE, and they were made by GOOGLE as a regular practice; and

b.     such records were generated by GOOGLE's electronic process or system that produces an accurate result, to wit:

1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of GOOGLE in a manner to ensure that they are true duplicates of the original records; and

2.     the process or system is regularly verified by GOOGLE, and at all times pertinent to the records certified here the process and system functioned properly and normally.

5

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                      Signature

6

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

FILED
RICHARD W. NAGEL
CLERK OF COURT

2018 JUL 25 PM 3:23

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINNATI

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO.** 1:18CR 109 |
| | : | |
| v. | : | **JUDGE** JUDGE BLACK |
| | : | |
| | : | **SEALED INDICTMENT** |
| **ANDREY SHUKLIN,** | : | |
| **SERGHEI VERLAN,** | : | 18 U.S.C. § 1962(d) |
| **PHYLLIS RICCI QUINCONES,** | : | **Forfeiture Allegation** |
|     a/k/a "Faith Ashford," | : | |
|     a/k/a "Grace Rubestello," | : | |
|     a/k/a "Phyllis Ricci," | : | |
|     a/k/a "Phyllis Ann," | : | |
| **EVGENIA KUKUY,** | : | |
|     a/k/a "Jenny K," | : | |
|     a/k/a "Evgenia Kukuv," | : | |
| **VLADIMIR PESTEREANU,** | : | |
|     a/k/a "Vova," | : | |
| **IEVGEN KARIAKA,** | : | |
|     a/k/a "Eugene," | : | |
| **AKHLIDDIN KALONOV,** | : | |
| **ROMAN IAKOVLEV,** | : | |
| **SANJAR FAYZIVEY,** | : | |
| **SERGEY BOCHAROV,** | : | |
| **JESSICA MARTIN,** | : | |
|     a/k/a "Emma Ricci," | : | |
|     a/k/a "Mary Austin," | : | |
| **SETH NEZAT,** | : | |
|     a/k/a "Andrew Johnson," | : | |
|     a/k/a "Andrew Butler," | : | |
|     a/k/a "Jason," | : | |
|     a/k/a "Kyle Walker," | : | |
| | : | |
|     **Defendants.** | : | |
| | : | |

THE GRAND JURY CHARGES:

## COUNT ONE
### (RICO Conspiracy)

1

## Introduction

At times relevant to this Indictment:

1.     The U.S. Department of Transportation ("USDOT"), Federal Motor Carrier Safety Administration ("FMCSA"), monitors and enforces regulations governing safety and commerce for interstate motor carriers, to include federal regulations governing the transportation of household goods by licensed motor carriers (*i.e.*, movers).

2.     Federal regulations require all interstate motor carriers transporting household goods for individual shippers by motor vehicle to follow federal regulations relating to the interstate transportation of household goods.

3.     Under federal regulations, motor carriers who move household goods must be licensed and registered with the USDOT. To do so, each interstate motor carrier must first apply to operate as a motor carrier of household goods and receive a USDOT number.

4.     Federal forms that interstate motor carriers must complete to operate as movers of household goods include the OP-1 form, the MCSA-1 form, and the MCS-150 form, which are registration and information forms. The OP-1 form, the MCSA-1 form, and the MCS-150 form require that a representative for the interstate motor carrier certify that all information contained in the respective form is true and correct.

5.     Under federal regulations, the USDOT requires interstate motor carriers, among other things, to provide estimates of moving charges to potential customers in writing, indicating whether the estimate is a "binding" or "nonbinding" estimate.

6.     With a binding estimate, the customer and the motor carrier must both agree in writing to a charge for services prior to the start of any work. When an estimate is binding, USDOT prohibits the interstate carrier from raising the price of the move unless the interstate motor carrier and the customer re-negotiate the price prior to the commencement of the move. USDOT regulations

forbid interstate motor carriers from increasing the price of a move above the price set forth in a binding estimate after loading customers' household goods.

7.　　　Failure to meet USDOT requirements can result in a motor carrier being "placed out of service," which means the interstate motor carrier is no longer authorized under federal law to operate as a mover of household goods, and must cease operations.

8.　　　On or about October 31, 2008, JBR Underground, LLC, doing business as United National Moving and Storage, was authorized by USDOT to operate as a mover of household goods. USDOT ordered JBR Underground, LLC to cease operating as a mover of household goods on or about September 14, 2015.

9.　　　On or about September 19, 2014, National Relocation Solutions was authorized by USDOT to operate as a mover of household goods. USDOT ordered National Relocation Solutions to cease operating as a mover of household goods on or about October 26, 2015.

10.　　　On or about November 18, 2014, Independent Van Lines submitted an application to USDOT to operate as a mover of household goods; however, Independent Van Lines failed to comply with other USDOT requirements to obtain authority to operate. USDOT dismissed the application on or about April 27, 2015.

11.　　　On or about December 24, 2014, National Relocation Van Lines was authorized by USDOT to operate as a mover of household goods. USDOT ordered National Relocation Van Lines to cease operating as a mover of household goods on or about September 17, 2015.

12.　　　On or about September 18, 2015, US Relocation Systems was authorized by USDOT to operate as a mover of household goods. USDOT ordered US Relocation Systems to cease operating as a mover of household goods on or about June 14, 2016.

3

13.     On or about March 17, 2016, First National Moving and Storage was authorized by USDOT to operate as a mover of household goods. USDOT ordered First National Moving and Storage to cease operating as a mover of household goods on or about October 4, 2016.

14.     On or about August 17, 2016, Public Moving and Storage was authorized by USDOT to operate as a mover of household goods. USDOT ordered Public Moving and Storage to cease operating as a mover of household goods on or about July 3, 2017.

15.     On or about February 21, 2017, Public Moving Services was authorized by USDOT to operate as a mover of household goods. USDOT ordered Public Moving Services to cease operating as a mover of household goods on or about October 18, 2017.

16.     On or about July 3, 2017, Smart Relocation Solutions, a/k/a Presidential Moving Services, was authorized by USDOT to operate as a mover of household goods. USDOT ordered Smart Relocation Solutions, a/k/a Presidential Moving Services, to cease operating as a mover of household goods on or about March 19, 2018.

17.     On or about December 19, 2017, Unified Van Lines was authorized by USDOT to operate as a mover of household goods. USDOT ordered Unified Van Lines to cease operating as a mover of household goods on or about May 25, 2018.

18.     On or about April 26, 2018, Flagship Van Lines was authorized by USDOT to operate as a mover of household goods.

### The Racketeering Enterprise

19.     At times relevant to this Indictment, the defendants, **ANDREY SHUKLIN, SERGHEI VERLAN, PHYLLIS RICCI QUINCOCES, a/k/a "Faith Ashford," "Grace Rubestello," "Phyllis Ricci," "Phyllis Ann," EVGENIA KUKUY, a/k/a "Jenny K," "Evgenia Kukuv," VLADIMIR PESTEREANU, a/k/a "Vova," IEVGEN KAKIAKA, a/k/a "Eugene," AKHLIDDIN KALONOV, ROMAN IAKOVLEV, SANJAR FAYZIVEY, SERGEY**

4

BOCHAROV, JESSICA MARTIN, a/k/a "Emma Ricci," "Mary Austin," and SETH NEZAT, a/k/a "Andrew Johnson," "Andrew Butler," "Jason," "Kyle Walker," and others known and unknown to the Grand Jury, operated and worked through the companies set forth in paragraphs 8 through 18 of the Indictment, namely, JBR Underground, LLC, United National Moving and Storage, National Relocation Solutions, Independent Van Lines, National Relocation Van Lines, US Relocation Systems, First National Moving and Storage, Public Moving and Storage, Public Moving Services, Smart Relocation Solutions, Presidential Moving Services, Unified Van Lines, and Flagship Van Lines, referred to collectively hereinafter as the "affiliated companies," as if they were a single corporate entity.

20.    At times relevant to this Indictment, the defendants, and others known and unknown to the Grand Jury, owned, operated, and worked as employees, members, and associates of the affiliated companies to move interstate shipments of household goods.

21.    At times relevant to this Indictment, **SHUKLIN** and **VERLAN** coordinated and directed lower-level employees, members, and associates of the affiliated companies.

22.    At times relevant to this Indictment, **SHUKLIN** and **VERLAN** operated the affiliated companies out of multiple locations throughout the United States, including Florida, Ohio, Maryland, North Carolina, Illinois, Texas, California, Connecticut, Colorado, and Missouri. **SHUKLIN** and **VERLAN** operated the affiliated companies principally out of a business address in Hollywood, Florida.  Starting on or about October 2015, **SHUKLIN** and **VERLAN** also operated the affiliated companies out of a warehouse in West Chester, Ohio, which is located in the Southern District of Ohio.

23.    The defendants, **ANDREY SHUKLIN, SERGHEI VERLAN, PHYLLIS RICCI QUINCOCES,** a/k/a "Faith Ashford," "Grace Rubestello," "Phyllis Ricci," "Phyllis Ann," **EVGENIA KUKUY,** a/k/a "Jenny K," "Evgenia Kukuv," **VLADIMIR PESTEREANU,** a/k/a

5

"Vova," IEVGEN KAKIAKA, a/k/a "Eugene," AKHLIDDIN KALONOV, ROMAN IAKOVLEV, SANJAR FAYZIVEY, SERGEY BOCHAROV, JESSICA MARTIN, a/k/a "Emma Ricci," "Mary Austin," and SETH NEZAT, a/k/a "Andrew Johnson", "Andrew Butler," "Jason," "Kyle Walker," and JBR Underground, LLC, United National Moving and Storage, National Relocation Solutions, Independent Van Lines, National Relocation Van Lines, US Relocation Systems, First National Moving and Storage, Public Moving and Storage, Public Moving Services, Smart Relocation Solutions, Presidential Moving Services, Unified Van Lines, and Flagship Van Lines, and others known and unknown to the Grand Jury, constituted an "Enterprise" as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals and entities associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce, referred to hereinafter as the "Moving Enterprise." The Moving Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives and purposes of the Moving Enterprise.

### Purposes of the Enterprise

24.     The purposes of the Moving Enterprise included the following:

(a)      Enrich the Moving Enterprise and the owners, operators, employees, members, and associates of the Moving Enterprise by defrauding, extorting, and stealing from customers who hired affiliated companies of the Moving Enterprise to move their household goods.

(b)      Promote and perpetuate the Moving Enterprise and shield its criminal affairs from law enforcement authorities and customers by concealing the true owners, operators, employees, and operations of affiliated companies of the Moving Enterprise.

### The Racketeering Conspiracy

25.     Between in or about April 2013, and continuing through the date of this Indictment, in the Southern District of Ohio and elsewhere, the defendants, ANDREY SHUKLIN, SERGHEI

VERLAN, PHYLLIS RICCI QUINCOCES, a/k/a "Faith Ashford," "Grace Rubestello," "Phyllis Ricci," "Phyllis Ann," EVGENIA KUKUY, a/k/a "Jenny K," "Evgenia Kukuv," VLADIMIR PESTEREANU, a/k/a "Vova," IEVGEN KAKIAKA, a/k/a "Eugene," AKHLIDDIN KALONOV, ROMAN IAKOVLEV, SANJAR FAYZIVEY, SERGEY BOCHAROV, JESSICA MARTIN, a/k/a "Emma Ricci," "Mary Austin," and SETH NEZAT, a/k/a "Andrew Johnson", "Andrew Butler," "Jason," "Kyle Walker," and others known and unknown to the Grand Jury, each being a person employed by, a member of, and associated with the Moving Enterprise, an Enterprise engaged in, and the activities of which affected, interstate and foreign commerce, together with others known and unknown to the Grand Jury, did knowingly and intentionally conspire to conduct and participate, directly and indirectly, in the conduct of the affairs of the Moving Enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1) and (5), consisting of multiple acts indictable under:

      (a)    18 U.S.C. § 1343 (relating to wire fraud) and § 2;

      (b)    18 U.S.C. § 659 (relating to the theft from interstate shipment) and § 2;

      (c)    18 U.S.C. § 1951(a) (relating to interference with commerce, robbery, or extortion) and § 2;

      (d)    18 U.S.C. § 1028(a) (relating to fraud and related activity in connection with identification documents) and § 2.

26.     It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Moving Enterprise.

<u>**Manner and Means of the Conspiracy**</u>

27.     Among the manner and means employed by the members in conducting and participating in the affairs of the Moving Enterprise were the following:

      (a)    It was part of the conspiracy that members of the Moving Enterprise furthered the conspiracy by making false representations to the USDOT and employees of the

7

USDOT in order for the Moving Enterprise, through the affiliated companies, to operate as an interstate mover of household goods. This included misrepresentations to the USDOT that affiliated companies of the Moving Enterprise did not share common owners, operators, managers, and employees.

(b)     It was further part of the conspiracy that members of the Moving Enterprise caused counterfeit identification documents (including counterfeit drivers' licenses) to be produced, transferred, used, and possessed to conceal the leadership of affiliated companies of the Moving Enterprise.

(c)     It was further part of the conspiracy that, after customers complained to the USDOT about the criminal actions taken by the Moving Enterprise, members of the Moving Enterprise submitted documents to federal regulators containing misrepresentations in order to operate a new affiliated company of the Moving Enterprise as an interstate carrier of household goods.

(d)     It was further part of the conspiracy that members of the Moving Enterprise used aliases when working on behalf of affiliated companies of the Moving Enterprise to conceal their identities from law enforcement and customers.

(e)     It was further part of the conspiracy that members of the Moving Enterprise submitted fake reviews to online sources regarding services provided by affiliated companies of the Moving Enterprise to induce customers to choose the Moving Enterprise.

(f)     It was part of the conspiracy that members of the Moving Enterprise used wire communications, such as emails, to send false representations to customers and potential customers to induce customers to hire affiliated companies of the Moving Enterprise to move the customers' household goods.

(g)     It was part of the conspiracy that members of the Moving Enterprise

8

furthered the conspiracy by emailing to customers "binding" moving estimates without first conducting an on-site inspection of the household goods.

(h)     It was further part of the conspiracy that binding estimates that members of the Moving Enterprise offered to customers were low so as to induce customers to hire the Moving Enterprise to move the customers' household goods.

(i)     It was further part of the conspiracy that, after agreeing to a binding estimate and loading customers' household goods, members of the Moving Enterprise increased the cost of moves above the price agreed to in the binding estimate.

(j)     It was further part of the conspiracy that, after agreeing to a binding estimate and loading customers' household goods, members of the Moving Enterprise falsely claimed that the customers' household goods took up more cubic footage than was set forth in the binding estimate.

(k)     It was further part of the conspiracy that members of the Moving Enterprise misrepresented to customers the amount of actual cubic footage of household goods involved in moves.

(l)     It was further part of the conspiracy that members of the Moving Enterprise knowingly charged customers for moving more cubic footage of household goods than was actually loaded by members of the Moving Enterprise, and others known and unknown to the Grand Jury.

(m)     It was further part of the conspiracy that members of the Moving Enterprise tracked the "actual" and "real" cubic feet of space that household goods occupied during moves.

(n)     It was further part of the conspiracy that members of the Moving Enterprise would send emails to each other containing documents detailing the "actual" and "real" cubic feet used during moves, along with documents detailing the cubic footage that was used to calculate the amount the Moving Enterprise charged to customers for the same moves.

(o)     It was further part of the conspiracy that, at times, members of the Moving

9

Enterprise caused customers' household goods to be stolen while transporting the goods interstate by not delivering the household goods after loading the household goods and receiving payment for moving the household goods.

        (p)     It was further part of the conspiracy that members of the Moving Enterprise extorted, and caused others known and unknown to the Grand Jury to extort, customers into paying money to the Moving Enterprise by increasing the cost of moves after loading customers' household goods and by refusing to relinquish customers' household goods until customers paid an inflated price for delivery of the household goods.

        (q)     It was further part of the conspiracy that a member of the Moving Enterprise threatened to injure another person who interfered with the Moving Enterprise's purposes.

### Overt Acts

    28.     In furtherance of the conspiracy and to achieve the illegal objective thereof, the following overt acts, among others, were committed in the Southern District of Ohio and elsewhere:

        (a)     On or about June 5, 2014, **SHUKLIN** filed an OP-1 form to the USDOT on behalf of National Relocation Solutions, LLC in which he certified falsely that he did not have any relationship with any other "FMCSA-regulated entity" within the past three years, despite his relationship with another FMCSA-regulated entity within the past three years.

        (b)     On or about June 4, 2015, **VERLAN** filed an OP-1 form to the USDOT on behalf of National Relocation Van Lines in which he certified falsely that he did not have any relationship with any other "FMCSA-regulated entity" within the past three years, despite his relationship with another FMCSA-regulated entity within the past three years.

        (c)     On or about August 4, 2015, **QUINCOCES** filed an OP-1 form to the USDOT on behalf of US Relocation Systems in which she certified falsely that she did not have any relationship with any other "FMCSA-regulated entity" within the past three years, despite her

relationship with another FMCSA-regulated entity within the past three years.

      (d)     On or about April 6, 2016, First National Moving and Storage provided documentation and payment to a third-party company for sales leads that was signed by **SHUKLIN** and an individual ("Individual-1"). Included with the documents was a photocopy of a counterfeit driver's license, where the picture and information on the counterfeit driver's license matched the picture and information on a valid driver's license for **KUKUY**, but was actually in the name of Individual-1.

      (e)     On or about October 18, 2016, Public Moving and Storage provided documentation to a third-party company for sales leads that was signed by **VERLAN** and another individual ("Individual-2"). Included with the documents was a photocopy of a counterfeit driver's license, in which the picture and information on the counterfeit driver's license matched the picture and information on a valid driver's license for a conspirator, but was actually in the name of Individual-2.

      (f)     On or about October 2, 2014, a member of the Moving Enterprise emailed a customer information about National Relocation Solutions, which referred falsely to being in business for 15 years.

      (g)     On or about June 19, 2015, a member of the Moving Enterprise emailed a customer regarding a move in Hamilton, Ohio information about National Relocation Van Lines, which stated falsely that National Relocation Van Lines was a family owned and operated company and had been in business since 1999.

      (h)     On or about January 22, 2016, a member of the Moving Enterprise emailed a customer regarding a move in Piscataway, New Jersey information about US Relocation Systems, referring falsely to being in business for 15 years.

      (i)     On or about October 25, 2017, the Internet webpage for First National

11

Moving and Storage stated falsely that First National Moving and Storage had 15 years of experience transporting household goods.

(j)　　On or about October 25, 2017, the Internet webpage for Public Moving Services stated falsely that Public Moving Services had "more than 15 years of experience."

(k)　　On or about October 25, 2017, the Internet webpage for Presidential Moving Services stated falsely that Presidential Moving Services had just celebrated its 20th anniversary.

(l)　　On or about July 31, 2015, members of the Moving Enterprise, acting through National Relocation Solutions, loaded and caused others known and unknown to the Grand Jury to load a customer's household goods located in Hamilton, Ohio, which is in the Southern District of Ohio. Members of the Moving Enterprise increased the cost of the move above the binding estimate after household goods were loaded on the moving truck. Members of the Moving Enterprise charged the customer for using 2,177 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 1,350 cubic feet of space.

(m)　　On or about November 5, 2015, members of the Moving Enterprise, acting through US Relocation Solutions, increased the cost of a customer's move above the binding estimate after the household goods were loaded. Members of the Moving Enterprise charged the customer for using 550 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 450 cubic feet of space. Members of the Moving Enterprise never delivered the customer's household goods despite taking possession of the household goods and receiving a down payment for delivery of the household goods.

(n)　　On or about July 10, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the Grand Jury to load a customer's goods to transport from Round Rock, Texas to Columbus, Ohio, which is located in the Southern District of Ohio. Members of Moving Enterprise increased the cost of the move

12

above the binding estimate after the household goods were loaded.  A member of the Moving Enterprise also told the customer that the customer had to agree to the higher price or the customer's household goods would not be returned to her.  The customer complained about the increased price during subsequent telephone calls from Columbus, Ohio to members of the Moving Enterprise. During one telephone call, a member of the Moving Enterprise told the customer that the Moving Enterprise would auction the customer's goods if the customer did not pay the higher price.  Members of the Moving Enterprise charged the customer for using 800 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 500 cubic feet of space.

(o)     On or about May 24, 2016, members of the Moving Enterprise, through First National Moving and Storage, increased the cost of a move above the binding estimate after the household goods were loaded.  When the customer requested that the movers unload the goods at the pickup site rather than pay the higher price, a member of the Moving Enterprise refused and told the customer that an additional payment was required for movers to unload the goods at the pickup site. Members of the Moving Enterprise charged the customer for using 4,150 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 3,300 cubic feet of space.  Members of the Moving Enterprise never delivered the customer's household goods, which were stored at the Moving Enterprise's warehouse in West Chester, Ohio, despite taking possession of the household goods and receiving a down payment for delivery of the household goods.

(p)     On or about May 24, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the Grand Jury to load a customer's goods to transport from Fort Wayne, Indiana to Middletown, Ohio, which is located in the Southern District of Ohio, and a storage unit.  Members of the Moving

13

Enterprise increased the cost of the move above the binding estimate after loading household goods. Members of the Moving Enterprise charged the customer for using 1,600 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 1,200 cubic feet of space.

(q)     On or about August 7, 2015, members of the Moving Enterprise, acting through National Relocation Solutions, loaded and caused others known and unknown to the Grand Jury to load a customer's goods to transport from Mt. Vernon, Ohio, which is located in the Southern District of Ohio, to Mountain View, Arkansas. Members of the Moving Enterprise charged the customer for using 4,000 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only approximately 3,000 cubic feet of space.

(r)     On or about June 8, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the Grand Jury to load a customer's goods to transport from Panama City, Florida to Glenville, North Carolina. Members of the Moving Enterprise charged the customer for using 1,100 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 750 cubic feet of space.

(s)     On or about July 30, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the Grand Jury to load loaded a customer's goods to transport from Monument, Colorado to Madison, Alabama. Members of the Moving Enterprise charged the customer for using 2,835 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 2,300 cubic feet of space.

(t)     On or about August 12, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the

14

Grand Jury to load a customer's goods to transport from Walton, Kentucky to College Station, Texas. Members of the Moving Enterprise increased the cost of the move above the binding estimate after loading household goods. Members of the Moving Enterprise charged the customer for using 2,751 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 2,300 cubic feet of space.

(u)     On or about August 15, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the Grand Jury to load a customer's goods to transport from Front Royal, Virginia to Golden, Colorado. Members of the Moving Enterprise charged the customer for using 1,700 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 1,300 cubic feet of space.

(v)     On or about August 21, 2016, members of the Moving Enterprise, acting through First National Moving and Storage, loaded and caused others known and unknown to the Grand Jury to load a customer's goods to transport from Steger, Illinois to Chandler, Arizona. Members of the Moving Enterprise charged the customer for using 2,800 cubic feet of space despite members of the Moving Enterprise knowing that the customer's household goods used only 2,300 cubic feet of space.

(w)     On or about June 16, 2017, members of the Moving Enterprise, through Public Moving Services, loaded and caused others known and unknown to the Grand Jury to load a customer's household goods to transport from Steilacoom, Washington to a storage facility in Clarksville, Tennessee. The customer made payments for the move and attempted to arrange delivery on multiple occasions. On or about October 12, 2017, the customer made arrangements with members of the Moving Enterprise to have the household goods delivered to the customer's new home in Tennessee. Members of the Moving Enterprise never delivered any of the customer's

15

household goods and never provided any explanation for not delivering the household goods.

(x)     On or about June 15, 2017, during a telephone call to a third-party company located in Maryland, **VERLAN** threatened to blow up a building owned by the third-party company and shoot the third-party company's employees.

**All in violation of Title 18, United States Code, Section 1962(d).**

## <u>FORFEITURE ALLEGATION</u>

29.     The allegations contained in Count One of this Indictment are hereby incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963, and Title 28, United States Code, Section 2461(c).

30.     Upon conviction of the offense set forth in Count One of this Indictment, the defendants, **ANDREY SHUKLIN, SERGHEI VERLAN, PHYLLIS RICCI QUINCOCES, a/k/a "Faith Ashford," "Grace Rubestello," "Phyllis Ricci," "Phyllis Ann," EVGENIA KUKUY, a/k/a "Jenny K," "Evgenia Kukuv," VLADIMIR PESTEREANU, a/k/a "Vova," IEVGEN KAKIAKA, a/k/a "Eugene," AKHLIDDIN KALONOV, ROMAN IAKOVLEV, SANJAR FAYZIVEY, SERGEY BOCHAROV, JESSICA MARTIN, a/k/a "Emma Ricci," "Mary Austin,** and **SETH NEZAT, a/k/a "Andrew Johnson," "Andrew Butler," "Jason," "Kyle Walker,"** shall forfeit to the United States, pursuant to 18 U.S.C. § 1963, including but not limited to:

(a)     any interest acquired or maintained in violation of 18 U.S.C. § 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

(b)     any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the

16

defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. § 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Tile 18, United States Code, Section 1963(a)(2); and

(c)     any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of 18 U.S.C. § 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3);

including, but not limited to, all defendants' ownership interests in the companies listed as part of the enterprise and all property constituting proceeds and a sum of money equal to an amount that represents the proceeds that the defendants obtained as a result of the offense.

## SUBSTITUTE ASSETS

31.     If any of the property described above, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

17

it is the intent of the United States, pursuant to 18 U.S.C. § 1963(m), to seek forfeiture of any other property of the defendants up to the value of the property described above.

**All pursuant to Title 18, United States Code, Sections 1962, 1963(a)(1), (2), and (3), and (m).**

A TRUE BILL.

_____
GRAND JURY FOREPERSON

BENJAMIN C. GLASSMAN
UNITED STATES ATTORNEY

_____
MATTHEW SINGER / MEGAN GAFFNEY
ASSISTANT UNITED STATES ATTORNEYS

18

EG

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with realcubatura@gmail.com that is stored at premises owned, maintained, controlled, or operated by Google, Inc., a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Google, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on January 8, 2019, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account from August 2013 to August 2018, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

2

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.  The Provider is hereby ordered to disclose the above information to the government within **14 days** of service of this warrant.

II.     **Information to be seized by the government**

1.   All information described above in Section I that constitutes evidence of

violations of 18 U.S.C. § 1962(d), those violations involving the financial or

business affairs of JBR Underground, LLC, United National Moving and Storage,

National Relocation Solutions, Independent Van Lines, National Relocation Van

Lines, US Relocation Systems, First National Moving and Storage, Public

Moving and Storage, Public Moving Services, Smart Relocation Solutions,

Presidential Moving Services, Unified Van Lines, and Flagship Van Lines, and

ANDREY SHUKLIN, SERGHEI VERLAN, PHYLLIS RICCI QUINCOCES,

a/k/a "Faith Ashford," "Grace Rubestello," "Phyllis Ricci," EVGENIA KUKUY,

a/k/a "Jenny K," "Evgenia Kukuv," VLADIMIR PESTEREANU, a/k/a "Vova,"

IEVGEN KARIAKA, a/k/a "Eugene," AKHLIDDIN KALONOV, ROMAN

IAKOVLEV, SANJAR FAYZIVEY, SERGEY BOCHAROV, JESSICA

MARTIN, a/k/a "Emma Ricci," "Mary Austin," and SETH NEZAT, a/k/a

"Andrew Johnson," "Andrew Butler," "Jason," "Kyle Walker," and others, and

occurring after August 2013 to August 2018, including:

(a)  The defrauding, stealing from, and extortion of customers seeking household

moving services of money and property; impeding and obstructing investigations

conducted by the government; false statements to federal regulators and

customers; and/or transferring false documentation, to include fraudulent driver

licenses.

4

(b) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(c) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user IDs, including records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the user IDs about matters relating to the financial and fraudulent business affairs of the Moving Enterprise, including records that help reveal their whereabouts.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by GOOGLE, Inc., and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of GOOGLE. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of GOOGLE, and they were made by GOOGLE as a regular practice; and

b.     such records were generated by GOOGLE's electronic process or system that produces an accurate result, to wit:

1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of GOOGLE in a manner to ensure that they are true duplicates of the original records; and

6

2.      the process or system is regularly verified by GOOGLE, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                              Signature

7